UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM ROWLAND, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>  v.<br><br>VANGUARD NATURAL RESOURCES, LLC, VNR FINANCE CORP., VANGUARD NATURAL GAS, LLC, VNR HOLDINGS, LLC, VANGUARD PERMIAN, LLC, ENCORE ENERGY PARTNERS OPERATING LLC, and ENCORE CLEAR FORK PIPELINE LLC,<br><br>    Defendants. | No. 16-cv-2021<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>[Rel. Case: 16-cv-1578-PKC] |

Plaintiff William Rowland, individually and on behalf of all others similarly situated, by his undersigned counsel, alleges the following upon personal knowledge as to his own acts, and upon information and belief based upon the investigation conducted by counsel as to all other matters.

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.    This is a class action against Vanguard Natural Resources, LLC ("**<u>Vanguard</u>**") and VNR Finance Corp. ("**<u>VFC</u>**" and, together with Vanguard, "**<u>Defendants</u>**") and each of the Guarantors (defined herein) brought by Plaintiff in his individual capacity and on behalf of all persons who beneficially held 7.875% Senior Notes due 2020 (CUSIP 92205CAA1) (the "**<u>2020 Notes</u>**") from February 10, 2016 to the present.[1]  The 2020 Notes were issued pursuant to an

---

[1] As defined below, the Class excludes holders of 2020 Notes who are Qualified Institutional Buyers ("**<u>QIBs</u>**") within the meaning of Rule 144A of the Securities Act.

April 4, 2012 Indenture (the "**Base Indenture**") and First Supplemental Indenture (the "**First Supplemental Indenture**," and with the Base Indenture, the "**Indentures**"),[2] each by the Defendants, the Guarantors party thereto (the "**Guarantors**" or "**Guarantor Defendants**") and U.S. Bank National Association ("**U.S. Bank**"), as trustee. The 2020 Notes were upon issuance, and are today, registered securities under the Securities Act of 1933 (the "**Securities Act**"). The 2020 Notes are senior unsecured obligations of Vanguard and VFC, which rank equally in right of payment with all of Vanguard's existing and future senior indebtedness, and which are unconditionally guaranteed by all of Vanguard's subsidiaries (other than VFC).

2.      Like many other energy companies, Vanguard has faced severe challenges due to falling oil and natural gas prices, putting pressure on Vanguard's ability to repay its debt obligations.  Vanguard attempted to alleviate its debt situation when, on January 8, 2016, the Defendants announced a proposed private debt exchange (the "**Exchange Offer**") whereby they would exchange and replace certain 2020 Notes for newly-issued 7.0% Senior Secured Second Lien Notes due 2023 (the "**2023 Notes**").  That Exchange Offer was consummated on February 10, 2016.  Specifically, $168,170,000 in aggregate principal amount of the 2020 Notes were exchanged in the Exchange Offer for $75,634,000 of 2023 Notes.  While approximately $550 million aggregate principal amount of 2020 Notes were outstanding prior to the Exchange Offer, approximately $381,830,000 in principal value of 2020 Notes were not tendered in the Exchange Offer and remain outstanding.

3.      Even though the 2020 Notes sold pursuant to registration statements and purchased by non-QIBs, the Defendants made the Exchange Offer under an exemption to the Securities Act.  As such, the only holders of 2020 Notes who were eligible to participate in the

---

[2] Copies of the Base Indenture and the First Supplemental Indenture are attached as Exhibits A and B, respectively.

Exchange Offer were Qualified Institutional Buyers ("**QIBs**") within the meaning of Rule 144A of the Securities Act – generally those that own and invest, on a discretionary basis, at least $100 million in securities.  For a broker-dealer the threshold is $10 million, and banks and savings and loan associations must also have a net worth of at least $25 million to satisfy the QIB criteria.  17 C.F.R. § 230.144A.

4.     The Defendants' decision created two classes of holders of 2020 Notes – the "haves" and the "have nots." The haves (i.e., the QIBs) were entitled to exchange unsecured 2020 Notes for new, secured 2023 Notes. The have nots (i.e., the non-QIBs) were denied the privilege of participating in the Exchange Offer.

5.     Moreover, the Defendants urged the haves (i.e., the QIBs) to accept the Exchange Offer and made dire prognostications of what would happen to the 2020 Notes if such noteholders did not participate in the Exchange Offer.  In a sad twist of irony, since the Confidential Offering Memorandum dated January 8, 2016 (the "**Exchange Offering Memorandum**") was deemed "confidential," it was concealed from the non-QIBs. As a result, the non-QIBs were not only precluded from participating in the Exchange Offer, but are unaware of the Defendants' view that such holders would suffer dire consequences as a result of the Exchange Offer.

6.     The Defendants' decision to pursue this transaction benefiting only themselves and a minority of 2020 Note holders violated the implied covenant of good faith and fair dealing. The decision of the Defendants to engage in a private exchange offer open only to QIBs, notwithstanding the fact that the 2020 Notes were sold pursuant to registration statements and purchased by non-QIBs, was unfair to holders of 2020 Notes who were excluded from the private exchange offer.  The risk of such an Exchange Offer was not disclosed by the Defendants

in their offering prospectus for the 2020 Notes,[3] nor could it have been foreseen by Plaintiff and the other Class members at the time they purchased their 2020 Notes.

7.    It is pervasive throughout the First Supplemental Indenture that holders of 2020 Notes shall not be treated differently. For example, the First Supplemental Indenture requires:

   a.  *pro rata* selection of 2020 Notes to be redeemed if less than all the 2020 Notes are redeemed,

   b.  that an Asset Sale Offer (as defined in Section 5.10) be made available *pro rata* to holders of 2020 Notes,

   c.  that an Asset Sale Offer comply with Rule 14e-1 of the Securities Exchange Act of 1934,

   d.  a Change of Control Offer (as defined in Section 5.15) be made available to each holder of 2020 Notes, and

   e.  that the solicitation of a Change of Control Offer be conducted to Rule 14e-1 of the Securities Exchange Act of 1934.

8.    Additionally, the direct effect of the Exchange Offer and the issuance of the 2023 Notes is that the obligations evidenced by the 2020 Notes are now effectively subordinate to the obligations evidenced by the 2023 Notes.  While the 2020 Notes are senior unsecured obligations of the Defendants, which rank equally in right of payment with all of Vanguard's existing and future senior indebtedness, and which are unconditionally guaranteed by all of Vanguard's subsidiaries (other than VFC), the Exchange Offer subordinates the 2020 Notes held by Class members to the QIBs holding 2023 Notes. In doing so, the Defendants impaired Class members' right to receive payment of the principal and interest under the 2020 Notes and the right to institute suit to compel such payment.  This disregard for the contractual rights of Plaintiff and other holders of 2020 Notes violated Section 316(b) of the Trust Indenture Act of 1939, 15

---

[3] A copy of the Prospectus Supplement for the issuance of 2020 Notes is attached as Exhibit C.

U.S.C. §§77aaa, *et seq.* (the "**TIA**"), and the terms of the Indentures.  Indeed, the TIA was intended to protect such minority holders from conduct of issuers and trustee, as present here.

9.      As a result of the Exchange Offer, the Defendants unjustly enriched themselves, reducing indebtedness, while impairing the rights of the Plaintiff and other Class members to receive principal and interest and reducing the value of the 2020 Notes. Plaintiff, on behalf of himself and all others similarly situated, seeks damages against Defendants and other appropriate relief.

## II.   JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action under Section 322(b) of the TIA, 15 U.S.C. §77vvv(b).

11.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2) because this matter is a class action in which the matter in controversy exceeds $5 million, and one or more members of the Class are citizens of a state different from any Defendant.

12.     Jurisdiction in this District for Plaintiff's supplemental state law claims is proper under 28 U.S.C. §1367.

13.     This Court has personal jurisdiction over Defendants under N.Y.C.P.L.R. §302(a) because Defendants maintain sufficient minimum contacts in this jurisdiction, including the marketing and sale of the 2020 Notes and the marketing and exchange of the 2023 Notes.

14.     Venue in this District is proper under Section 322(b) of the TIA, 15 U.S.C. §77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. §77v(a), and 28 U.S.C. §1391(b) and (c).  Defendants transact business within this District, and a substantial part of the events giving rise to the claims occurred in this District, including the marketing and sale of the 2020 Notes and the marketing and exchange of the 2023 Notes.  Indeed, the First Supplemental

Indenture states, "the law of the State of New York will govern and be used to construe this indenture, the notes and the note guarantees."  Lastly, the Plaintiff resides in New York County.

## III.    PARTIES

15.    Plaintiff Rowland acquired 2020 Notes prior to the announcement of the Exchange Offer and has continued to hold 2020 Notes at all times relevant to this action.  Mr. Rowland is not a QIB within the meaning of Rule 144A of the Securities Act, and is inside the United States within the meaning of Regulation S of the Securities Act, and was therefore ineligible to participate in the Exchange Offer.

16.    Defendant Vanguard Natural Resources, LLC is a Delaware limited liability company with its principal executive offices in Houston, Texas.  Vanguard is a co-issuer of the 2020 Notes.

17.    Defendant VNR Finance Corp. is a Delaware corporation that is a wholly owned subsidiary of Vanguard Natural Resources, LLC.  VFC is a co-issuer of the 2020 Notes.  VFC has no material assets, and was formed for the sole purpose of being a co-issuer of Vanguard debt.

18.    Defendant Vanguard Natural Gas, LLC, is a guarantor under the First Supplemental Indenture.

19.    Defendant VNR Holdings, LLC, is a guarantor under the First Supplemental Indenture.

20.    Defendant Vanguard Permian, LLC, is a guarantor under the First Supplemental Indenture.

21.    Defendant Encore Energy Partners Operating LLC, is a guarantor under the First Supplemental Indenture.

22.    Defendant Encore Clear Fork Pipeline LLC is a guarantor under the First Supplemental Indenture.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND ON VANGUARD AND ITS INDEBTEDNESS

23.    Vanguard is a publicly traded LLC focused on the acquisition and development of mature, long-lived oil and natural gas properties in the United States.  Vanguard was formed in October 2006, and completed its initial public offering in October 2007.  Its common units are listed on the NASDAQ Global Select Market under the symbol "VNR."

24.    The Defendants are an independent energy company "focused on the acquisition and development of mature, long-lived oil and natural gas properties in the United States. [Their] primary business objective is to generate stable cash flows, allowing us to make monthly cash distributions to our unitholders and, over time, to increase our monthly cash distributions through the acquisition of additional mature, long-lived oil and natural gas properties." Vanguard Natural Resources, LLC Form 10-Q for the period ended September 30, 2015, p. 7.

25.    As of December 8, 2015, the Defendants had approximately $1.694 billion of outstanding borrowings under the Third Amended and Restated Credit Agreement (the "**Reserve-Based Credit Facility**").  *See* Presentation by Vanguard Natural Resources, LLC given at a December 8, 2015 conference hosted by Wells Fargo (http://www.vnrllc.com/wp-content/uploads/2015/12/VNR_Wells-Fargo_Dec_2015_FINAL.pdf),[4] p. 16.

26.    As of December 8, 2015, Vanguard had $51.1 million outstanding in aggregate principal amount of 8.375% Senior Notes due 2019.  *Id.*

---

[4] Attached as Exhibit D.

27.     On April 4, 2012, Vanguard and VFC issued 2020 Notes with a principal value of $350 million pursuant to an Indenture and First Supplemental Indenture.

28.     These 2020 Notes were registered pursuant to the Registration Statement on Form S-3 filed with the U.S. Securities and Exchange Commission on January 18, 2012 (the "**Registration Statement**").

29.     The 2020 Notes are senior unsecured obligations of Vanguard and VFC that rank equally in right of payment with all of Defendants' existing and future senior indebtedness.  The 2020 Notes are unconditionally guaranteed, jointly and severally, on an unsecured basis by all of Vanguard's subsidiaries (other than VFC).

30.     Vanguard and VFC made a public offering of an additional $200 million in principal value of 2020 Notes on October 3, 2012.  The issuance of these additional 2020 Notes was completed on October 9, 2012.  These additional 2020 Notes "have identical terms, other than the issue date, and constitute part of the same series as and are fungible with the Senior Notes."  These additional 2020 Notes were registered pursuant to the Registration Statement.

31.     Prior to the Exchange Offer, the total principal value of the 2020 Notes outstanding was approximately $550 million.

B.     THE EXCHANGE OFFER

32.     Vanguard, like many other energy companies, has faced severe challenges from recent declines in oil and natural gas prices.  Since the beginning of 2015, at least 48 North American oil and gas producers have filed for bankruptcy, involving over $17.3 billion in cumulative secured and unsecured debt.  At least six producers filed for bankruptcy between just the beginning of 2016 and February 7, 2016.

33.     In the fourth quarter of 2014, Vanguard recognized an impairment of $234.4 million of its oil and natural gas properties as a result of declining energy prices, and in the third

quarter of 2015, Vanguard recognized a $1.4 billion impairment. On December 18, 2015, Vanguard reduced its distribution to unitholders (*i.e.*, shareholders) from 12 cents per month to just 3 cents.

34.     Vanguard's financial troubles have affected its ability to repay the 2020 Notes. On December 11, 2015, Moody's Investor Service announced that it had downgraded Vanguard's corporate family rating to B3 from B1, and downgraded the 2020 Notes' rating to Caa2 from B3, with a negative outlook. Moody's explained that:

> Vanguard's B3 CFR reflects its weak cash flow metrics (retained cash flow to debt of 6.4% as of 30 September 2015), weak liquidity and high leverage, as well as Moody's expectation that these metrics will deteriorate over the next 12-18 months if the current weak oil and gas price environment continues. The company has benefited from having a significant portion of its 2015 production hedged. In 2016, its hedges will drop, covering 69% of natural gas production and 59% of oil production. In 2017, hedged volumes will decrease even more to cover only 39% natural gas production and 17% of oil production, which will have a material negative impact on cash flows at current commodity prices.

35.     The fact that VNR's hedges are rolling off is a particularly bad portent for VNR. As an analyst noted in a November 17, 2015 *Seeking Alpha* article, "In 2015 VNR could only pay a distribution due to its hedges; without hedges cash flow would not be sufficient to cover distributions, and barely covers maintenance capital expenditures and interest expense. With hedge coverage declining in 2016 and drastically in 2017, time is running short for energy prices to recover." The analyst also noted that the bonds' then-current prices were at a level "that typically reflects strong concerns that an issuer will go bankrupt."

36.     On January 8, 2016, Defendants announced the commencement of the Exchange Offer, whereby certain eligible holders of the 2020 Notes would be given the opportunity to exchange those bonds for 2023 Notes. Eligible holders participating in the Exchange Offer received between $400 and $450 in 2023 Notes for each $1,000 principal amount of 2020 Notes tendered (depending on when the holders tendered).

37.     Because Defendants chose not to register the 2023 Notes under the Securities Act, the Exchange Offer was extended only to QIBs and persons located outside of the United States within the meaning of Rule 144A.  Plaintiff and the Class were not given the opportunity to participate in the Exchange Offer, or even to receive the documents informing them of how the Exchange Offer would affect their interests.

38.     The exact terms of the Exchange Offer are set forth in the Exchange Offering Memorandum.  While investors who accepted the Exchange Offer and exchanged their 2020 Notes for 2023 Notes would collect a reduced interest rate and reduced principal amounts, and agreed to a later maturity date, the 2023 Notes enjoy a substantial advantage over the 2020 Notes in that they now have a second lien security interest in the Defendants' property.  This right is especially valuable in light of the Defendants' financial condition, and provides holders of the 2023 Notes a superior position to holders of the 2020 Notes should the Defendants require an out-of-court or in-court restructuring or reorganization.

39.     The 2023 Notes are senior secured second lien obligations of Vanguard and VFC that are jointly and severally guaranteed on a senior secured basis by all of Vanguard's subsidiaries (other than VFC).  The 2023 Notes are secured by a second-priority lien on the assets that secure Vanguard's Reserve-Based Credit Facility (subject to certain exceptions). Since Vanguard's Reserve-Based Credit Facility is secured by substantially all of its assets, the 2023 Notes are also secured by substantially all of Vanguard's assets.

40.     Due to these lien priority rights, the 2020 Notes are effectively subordinate to the 2023 Notes as the 2023 Notes enjoy the protection of collateral not available to the 2020 Notes. Moreover, guarantees of the 2020 Notes is now effectively subordinate to the secured guarantee of the 2023 Notes.

41.    The Exchange Offer expired at 11:59 PM, New York City time, on February 5, 2016.   On February 8, 2016, Defendants announced the Exchange Offer's final results. Defendants reported that $168,170,000 in aggregate principal amount of the 2020 Notes, representing approximately 30.6% of the outstanding principal amount of the 2020 Notes, had been validly tendered and not withdrawn.[5]  Defendants further reported that they expect to accept all of the tendered 2020 Notes for exchange.

42.    The settlement date for the Exchange Offer was February 10, 2016, on which date Defendants issued $75,634,000 in aggregate principal amount of 2023 Notes to the eligible holders who participated in the Exchange Offer.  On February 10, 2016, the Defendants issued the 2023 Notes to eligible holders of 2020 Notes who tendered their 2020 Notes pursuant to an indenture (the "**2023 Notes Indenture**") by and between the Defendants and U.S. Bank, as indenture Trustee and Collateral Trustee (as each term is defined in the 2023 Notes Indenture).[6]

43.    The 2023 Notes "were issued in accordance with exemptions from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") afforded by Rule 144A and Regulation S under the Securities Act."[7]

44.    U.S. Bank and the Defendants are parties to a "Second Lien Pledge and Security Agreement: dated as of February 10, 2016.[8] U.S. Bank and certain subsidiaries of the Defendants are parties to a "Second Lien Pledge and Security Agreement: dated as of February 10, 2016.[9]

---

[5]    *See* Vanguard Natural Resources Press Release dated February 8, 2016, available at http://www.vnrllc.com/2016/02/08/vanguard-natural-resources-announces-expiration-and-final-results-of-offer-to-exchange-any-and-all-outstanding-senior-notes-due-2020-for-new-senior-secured-second-lien-notes-due-2023/.    A copy of the February 8, 2016 press release is attached as Exhibit E hereto.

[6] *See* VNR's Form 8-K filed February 17, 2016 without exhibits (attached as Exhibit F); *see also* the 2023 Notes Indenture (attached as Exhibit G), filed by VNR in its Form 8-K filed February 17, 2016 as Ex. 4.1.

[7] *See* VNR's Form 8-K filed February 17, 2016.

[8] *See* Exhibit 10.1 to VNR's Form 8-K filed February 17, 2016 (attached as Exhibit H).

[9] *See* Exhibit 10.2 to VNR's Form 8-K filed February 17, 2016 (attached as Exhibit I).

U.S. Bank and the Defendants are parties to a "Collateral Trust Agreement" dated as of February 10, 2016.[10]

### C.    THE EXCHANGE OFFER DAMAGED PLAINTIFF AND OTHER CLASS MEMBERS WHO WERE NOT ENTITLED TO PARTICIPATE

45.    Because Plaintiff and other Class members are not QIBs and are located within the United States, Plaintiff and other Class members were denied the opportunity to participate in the Exchange Offer, or even to receive the Exchange Offering Memorandum.  Despite the fact that Defendants knew that the Exchange Offer would negatively impact the liquidity, marketability and market price of the 2020 Notes, Defendants concealed that information from Plaintiff and the Class members, making these important disclosures only to the QIBS.

46.    Not only did the Exchange Offer have the negative practical implications discussed above (amongst others), but it also breached Plaintiff's and the Class's rights under the First Supplemental Indenture.

### D.    REGISTRATION OF THE 2020 NOTES AND KEY PROVISIONS OF THE INDENTURES

47.    The 2020 Notes were issued pursuant to a Prospectus Supplement dated March 30, 2012, filed pursuant to Rule 424(b)(5) of the Securities Act. That Prospectus Supplement, filed with the United States Securities and Exchange Commission (the "**SEC**") supplemented the Defendants' registration statement on Form S-3 filed with the SEC and dated January 18, 2012. At the time the Defendants registered the 2020 Notes, they purported to meet all the reporting requirements listed under sections 12 or 15(d) of the Securities Exchange Act of 1934, which assumes that the company seeking registration already has some form of security filed with the SEC.

---

[10] *See* Exhibit 10.4 to VNR's Form 8-K filed February 17, 2016 (attached as Exhibit J).

48.     Under the First Supplemental Indenture, all beneficial holders have the right to receive principal and interest. Specifically, Section 7.07 of the First Supplemental Indenture provides:

> Notwithstanding any other provision of this Indenture, ***the right of any Holder of a Note to receive payment of principal of***, or premium or interest, if any, on, the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or ***to bring suit for the enforcement of any such payment*** on or after such respective dates, ***shall not be impaired or affected without the consent of such Holder***.

First Supp. Indenture, §7.07 (emphasis added).

49.     The provisions of Section 7.07 of the First Supplemental Indenture are mandated by Section 316(b) of the TIA, 15 U.S.C. §77ppp(b), which the First Supplemental Indenture acknowledges. *See* First Supp. Indenture, at [i].

50.     Section 7.06 of the First Supplemental Indenture (the "**No-Action Clause**") provides that:

> No Holder of a Note may pursue any remedy with respect to this Indenture or the Notes unless:
>
> (a) such Holder has previously given to the Trustee written notice than an Event of Default is continuing;
>
> (b) Holders of at least 25% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;
>
> (c) such Holder or Holders offer and, if requested, provide to the Trustee security or indemnity reasonably satisfactory to the Trustee against any loss, liability or expense;
>
> (d) the Trustee does not comply with such request within 60 days after receipt of the request and the offer of security or indemnity; and
>
> (e) during such 60-day period, Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with such request.

> ***A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.***

First Supp. Indenture, §7.06 (emphasis added).

51.     Section 4.02 of the First Supplemental Indenture requires that redemptions of less than all 2020 Notes must be made on a *pro rata* basis to all holders, as expressly stated:

> ***[i]f less than all of the Notes are to be redeemed at any time***, the Trustee will ***select Notes for redemption on a pro rata basis*** (or, in the case of Notes issued in global form pursuant to Article 3 hereof, by such method as DTC or its nominee or successor may require or, where such nominee or successor is the Trustee, ***a method that most nearly approximates pro rata selection as the Trustee deems fair and appropriate***) unless otherwise required by law or applicable stock exchange or depositary requirements."

First Supp. Indenture, §4.02 (emphasis added).

52.     Section 4.09 of the First Supplemental Indenture requires that "in the event that … the Defendants are required [under Section 5.10] to commence an asset Sale Offer to all holders to purchase [2020] Notes, redemptions of less than all 2020 Notes must be made on a *pro rata* basis to all holder.  First Supplemental Indenture, Section 4.09. That section states: "The Asset Sale Offer shall be made to all Holders [of 2020 Notes]…"  *Id*.  Section 4.09(h) provides:

> if the aggregate principal amount of Notes surrendered by Holders thereof exceeds the Offer Amount allocated to the purchase of Notes in the Asset Sale Offer, the Trustee will select the Notes to be purchased on a *pro rata* basis (except that any Notes represented by a Global Note shall be selected by such method as DTC or its nominee or successor may require or, where such nominee or successor is the Trustee, a method that most nearly approximates *pro rata* selection as the Trustee deems fair and appropriate) based on the principal amount of Notes surrendered …

First Supp. Indenture, §4.09(h).

53.     Section 5.10(f) provides that

> Any Net Proceeds from Asset Sales that are not applied or invested as provided in Section 5.10(c) will constitute *"Excess Proceeds."* When the aggregate amount of Excess Proceeds exceeds $20.0 million, within five days thereof, ***the Company will make an offer (an "Asset Sale Offer") to all Holders of the Notes*** and all

holders of other Indebtedness that is *pari passu* with the Notes containing provisions similar to those set forth in this Indenture with respect to offers to purchase, prepay or redeem with the proceeds of sales of assets **to purchase, prepay or redeem, on a pro rata basis, the maximum principal amount of Notes** and such other *pari passu* Indebtedness (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, incurred in connection therewith) **that may be purchased, prepaid or redeemed out of the Excess Proceeds….If the aggregate principal amount of Notes tendered in such Asset Sale Offer exceeds the amount of Excess Proceeds allocated to the purchase of Notes, the Trustee will select the Notes to be purchased on a pro rata basis** (except that any Notes represented by a Note in global form will be selected by such method as DTC or its nominee or successor may require or, where such nominee or successor is the Trustee, a method that most nearly approximates *pro rata* selection as the Trustee deems fair and appropriate), …

First Supp. Indenture, §5.10(f) (emphasis added).

54.     The First Supplemental Indenture requires that an Asset Sale Offer comply with Rule 14e-1 of the Securities Exchange Act of 1934 (17 C.F.R. § 240.14e-1) governing tender offers and exchange offers.  Section 5.10 (g) provides:

> **The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Sale Offer**. To the extent that the provisions of any securities laws or regulations conflict with Section 4.09 or this Section 5.10, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under Section 4.09 or this Section 5.10 by virtue of such compliance.

First Supp. Indenture, §5.10(g) (emphasis added).

55.     Moreover, Section 5.15 of the First Supplemental Indenture requires that an offer to repurchase upon a Change of Control (as such term is defined in the Indentures) is also required to comply with Rule 14e-1 of the Securities Exchange Act of 1934. Section 5.15 provides:

> (a) If a Change of Control occurs, **each Holder of Notes will have the right to require the Company to repurchase all or any part** (equal to $2,000 or an integral multiple of $1,000 in excess thereof) **of that Holder's Notes pursuant to a cash tender offer** ("Change of Control Offer") on the terms set forth in this

Section 5.15. In the Change of Control Offer, the Company will offer a payment in cash ("Change of Control Payment") equal to 101% of the aggregate principal amount of Notes repurchased, plus accrued and unpaid interest, if any, on the Notes repurchased to the date of purchase (the "Change of Control Purchase Date"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.… ***The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control***. To the extent that the provisions of any securities laws or regulations conflict with this Section 5.15, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 5.15 by virtue of such compliance.

56.     First Supp. Indenture, §5.15 (emphasis added).Under the First Supplemental Indenture, the Guarantor Defendants agreed, jointly and severally, to guarantee the obligations under the Notes or the obligations of the issuers under the First Supplemental indenture. Specifically, Section 11.01(a) provides:

(a) Subject to this Article 11, each of the Guarantors hereby, jointly and severally, unconditionally Guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuers hereunder or thereunder, that: (1) the principal of, or premium or interest, if any, on, the Notes will be promptly paid in full when due, whether at stated maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of, or premium or interest, if any, on, the Notes, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; … Failing payment when due of any amount so Guaranteed or any performance so Guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a Guarantee of payment and not a Guarantee of collection.

First Supp. Indenture, §11.01.

57.     U.S. Bank is the Trustee under the First Supplemental Indenture.  First Supp. Indenture, §2.01 (definition of "Trustee").

58.     Section 13.08 of the First Supplemental Indenture states in relevant part that "THE LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO

CONSTRUE THIS INDENTURE, THE NOTES AND THE NOTE GUARANTEES."   First

Supp. Indenture, §13.08 (emphasis in original).

### E.   THE NO-ACTION CLAUSE DOES NOT APPLY HERE

59.     Section 7.06 of the First Supplemental Indenture provides that:

No Holder of a Note may pursue any remedy with respect to this Indenture or the
Notes unless: (a) such Holder has previously given to the Trustee written notice
than an Event of Default is continuing; (b) Holders of at least 25% in aggregate
principal amount of the then outstanding Notes make a written request to the
Trustee to pursue the remedy; (c) such Holder or Holders offer and, if requested,
provide to the Trustee security or indemnity reasonably satisfactory to the Trustee
against any loss, liability or expense; (d) the Trustee does not comply with such
request within 60 days after receipt of the request and the offer of security or
indemnity; and (e) during such 60-day period, Holders of a majority in aggregate
principal amount of the then outstanding Notes do not give the Trustee a direction
inconsistent with such request.

60.     Sections (d) and (e) of the No-Action Clause provide for a 60-day waiting period

during which the Trustee must wait for guidance from a majority of the noteholders after

receiving a written request to initiate an action from 25% or more of the noteholders.  Here,

Defendants announced the Exchange Offer on January 8, 2016, the Exchange Offer expired on

February 5, 2016, and settlement of the Exchange Offer occurred on February 10, 2016, with the

2023 Notes and attendant security interest being issued and granted on February 10, 2016.  Thus,

noteholders were incapable of challenging the Exchange Offer through the Trustee, since the

Exchange Offer was scheduled to close after only approximately a month, well before the 60-day

waiting period could run.

61.     Moreover, the Trustee itself is subject to a debilitating conflict of interest

preventing it from bringing claims with respect to the Exchange Offer.  U.S. Bank is the Trustee

for both the 2020 Notes and the 2023 Notes.  Additionally, U.S. Bank is also the collateral agent,

paying agent and registrar for the 2023 Notes.  U.S. Bank is receiving compensation for the new

services it provides under the 2023 Notes and related security and collateral agreements.  As

17

such, if U.S. Bank successfully challenged the Exchange Offer, it would lose out on the fees that it would otherwise earn as Trustee for the 2023 Notes.

62.     Because it was impossible for Plaintiff or any holders of the 2020 Notes to comply with the No-Action Clause before the Exchange Offer expired, and because the Trustee faced its own conflict of interest preventing it from challenging the Exchange Offer on its own initiative, the No-Action Clause does not apply here.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined as: all persons who beneficially held the 2020 Notes during the period February 10, 2016 to the present, who are not QIBs within the meaning of Rule 144A of the Securities Act; and who are inside the United States within the meaning of Regulation S of the Securities Act.

64.     Upon information and belief, the members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  While $550,000,000 in aggregate principal amount of 2020 Notes was outstanding prior to the Exchange Offer, $168,170,000 in 2020 Notes were tendered in the Exchange Offer.  Thus, noteholders holding hundreds of millions of dollars in principal value of 2020 Notes did not tender in the Exchange Offer.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds of members in the proposed Class.

65.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.      whether Defendants' actions violated the TIA;

b.      whether Defendants' actions breached the First Supplemental Indenture;

c.      whether Defendants' actions breached the implied covenant of good faith and fair dealing with respect to the Base Indenture and First Supplemental Indenture; and

d.      the extent of damages sustained by Class members, and the appropriate measure of damages or declaratory relief.

66.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

67.      Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

68.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT ONE
### The Trust Indenture Act – 15 U.S.C. §§77aaa, *et seq.*
### Against the Defendants

69.      Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

70.      The 2020 Notes are debt securities qualified under the TIA, which regulates debt securities.

71.      Section 316(b) of the TIA, 15 U.S.C. §777ppp(b), requires that Plaintiff and other noteholders' right to receive payment of principal and interest on a debt security on or after their respective due dates expressed in the Indentures shall not be impaired or affected without the consent of each holder.  Section 316(b) further provides that Plaintiff's and other noteholders'

right to institute suit to compel such payment, may not be impaired by the Indentures, without the consent of each holder.

72.     The Exchange Offer impaired the rights of Plaintiff and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their 2020 Notes are now subordinated to 2023 Notes with respect to assets of the Defendants to which the 2023 Notes have liens.

73.     Defendants did not have the consent of Plaintiff or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiff's and the Class's rights under the Indentures governing the 2020 Notes.

74.     Defendants thereby violated the TIA.  Plaintiff and the Class have suffered damages as a result of Defendants' violations of the TIA and will continue to be damaged in the future.

75.     Accordingly, Plaintiff and the Class are entitled to the declaratory relief sought in Count Five.

### COUNT TWO
**Breach of Contract, First Supplemental Indenture, Section 7.07**
**Against the Defendants**

76.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

77.     The First Supplemental Indenture was at all relevant times a valid and enforceable contract.

78.     Section 7.07 of the First Supplemental Indenture promised Plaintiff and members of the Class the unconditional right to receive principal and interest payments from the Defendants and to institute suit to compel such payment without the consent of each holder. First Supplemental Indenture, §7.07.

79.     The Exchange Offer impaired the rights of Plaintiff and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their 2020 Notes are now subordinated to 2023 Notes with respect to assets of the Defendants to which the 2023 Notes have liens.

80.     Defendants did not have the consent of Plaintiff or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiff's and the Class's rights under the Indentures governing the 2020 Notes.

81.     Accordingly, Plaintiff and the Class are entitled to the declaratory relief sought in Count Five.

82.     In addition, as a result of the Defendants' breach of the First Supplemental Indenture, Plaintiff and the Class have suffered damages in an amount to be determined at trial.

**COUNT THREE**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**Against the Defendants**

83.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

84.     The Indenture and the First Supplemental Indenture were at all relevant times valid and enforceable contracts.

85.     Like all contracts under New York law, the First Supplemental Indenture incorporates an implied covenant of good faith and fair dealing.

86.     The Defendants' course of conduct violated the implied covenant of good faith and fair dealing and public policy because:

> a.   The Defendants disregarded the fact that the 2020 Notes were securities, registered pursuant to the Securities Act, that could be purchased by anyone, irrespective of whether such person was a QIB or a not a QIB;

21

b.  Through the Exchange Offer, the Defendants voluntarily engaged in a private exchange offer, offered the QIBs only the opportunity to exchange their 2020 Notes for new, second lien, 2023 Notes, and leaving the QIBs in the enviable position of being able to decide whether to participate in the Exchange Offer;

c.  As a consequence of the Defendants' decision to make a private exchange offer of unregistered securities, the Defendants deprived the non-QIBs of that ability to make the decision offered to the QIBs;

d.  The Defendants did so, thus thwarting the non-QIBs ability to participate in the Exchange Offer, notwithstanding the fact that the 2020 Notes were previously registered and eligible to be purchased by non-QIBs; and

e.  The Defendants also did so, notwithstanding the fact that the First Supplemental Indenture requires

  i.  non-prejudicial actions by individual 2020 Noteholders in enforcing their rights under the Indentures,

  ii.  *pro rata* selection of 2020 Notes to be redeemed if less than all the 2020 Notes are redeemed,

  iii.  that an Asset Sale Offer (as defined in Section 5.10) be made available *pro rata* to holders of 2020 Notes,

  iv.  that an Asset Sale Offer comply with Rule 14e-1 of the Securities Exchange Act of 1934,

  v.  a Change of Control Offer (as defined in Section 5.15) be made available to each holder of 2020 Notes, and

vi. that the solicitation of a Change of Control Offer be conducted to Rule 14e-1 of the Securities Exchange Act of 1934.

87. Among other things, the First Supplemental Indentures' provisions in the preceding paragraph demonstrate that, under that indenture, the holders of 2020 Notes were to be treated equally irrespective of whether such holders were QIBs or non-QIBs.

88. Defendants' actions deprived Plaintiff of the benefit of his bargain under the 2020 Notes Indenture. Indeed, Defendants' actions will ultimately deprive Plaintiff of the ultimate benefit of the Indentures – the right to receive payment of principal and interest.

89. No reasonable person would have anticipated the Defendants' course of conduct. If it had been disclosed that the Defendants might offer an advantageous exchange offer to only the QIBs, but not to the non-QIBs, no reasonable non-QIB would have entered into the contract.

90. Defendants thereby breached the implied covenant of good faith and fair dealing. Plaintiff and the Class have suffered damages as a result of Defendants' breach of the implied covenant and will continue to be damaged in the future.

**COUNT FOUR**
**Unjust Enrichment**
**Against the Defendants**

91. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

92. By entering into the Exchange Offer, Defendants unjustly enriched themselves. The Exchange Offer allowed Defendants to eliminate hundreds of millions of debt incurred under the Indentures.

93. The Exchange Offer enriched Defendants at the expense of Plaintiff and the Class. As a direct and intentional result of the Exchange Offer, the 2020 Notes held by Plaintiff and the Class have been subordinated to the 2023 Notes with respect to assets of the Defendants

to which the 2023 Notes have liens, reducing the value of the 2020 Notes and impairing the rights of Plaintiff and other Class members under the Indentures to receive interest and principal.

94.     Equity and good conscience militate against permitting Defendants to retain the benefits of the Exchange Offer, since those benefits were obtained by intentionally violating Plaintiff's and the Class's contractual rights under the Indentures in a discriminatory manner.

**COUNT FIVE**
**Declaratory Judgment**
**Against the Defendants**

95.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

96.     An actual controversy exists between Plaintiff and Defendants regarding the validity and enforceability of the Exchange Offer and the 2023 Notes, and a declaration of rights under the Indentures is necessary and appropriate to establish that the Exchange Offer is ineffective and that the Liens purportedly created in the Exchange Offer for the benefit of the 2023 Notes are null and void, ineffective and invalid.

97.     Under the TIA, Defendants were prohibited from impairing the rights of Plaintiff and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment.

98.     The Exchange Offer impaired the rights of Plaintiff and other Class members under the Indentures to receive interest and principal and to institute suit to compel such payment because their 2020 Notes are now subordinated to 2023 Notes with respect to assets of the Defendants to which the 2023 Notes have liens.  Defendants did not have the consent of Plaintiff or the Class to consummate and finalize the Exchange Offer, or to otherwise impair Plaintiff's and the Class's rights under the Indentures governing the 2020 Notes.

99.     Accordingly, Plaintiff requests a declaration, pursuant to 28 U.S.C. § 2201, that the Exchange Offer is null and void, ineffective and invalid, that any Liens created in the Exchange Offer for the benefit of the 2023 Notes are null and void, ineffective and invalid and that the Exchange Offer resulted in an Event of Default (as such term is defined in the First Supplemental Indenture).

**COUNT SIX**
**Declaratory Judgment**
**Against the Guarantor Defendants**

100.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

101.     The terms of the First Supplemental Indenture, Base Indenture and Guarantee were at all times herein valid and enforceable contract obligations of the Guarantors.

102.     An actual controversy exists between Plaintiff and Guarantor Defendants regarding the validity and enforceability of the Exchange Offer and the 2023 Notes, and a declaration of rights under the Indentures is necessary and appropriate to establish any amounts due and owing by the Defendants would also be due and owing by the Guarantor Defendants.

103.     Accordingly, Plaintiff requests a declaration, pursuant to 28 U.S.C. § 2201, that any damages payable by the Defendants hereunder shall also be payable by the Guarantor Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the Class the declaratory relief requested herein;

C.     Awarding Plaintiff and the Class damages, in an amount to be determined at trial;

D.     Awarding Plaintiff reasonable costs and attorneys' fees; and

E.     Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury.

Dated: March 18, 2016

**GRANT & EISENHOFER P.A.**

Jay W. Eisenhofer
Gordon Z. Novod
David M. Haendler (*pro hac vice to be filed*)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel:  646-722-8500
Fax:  646-722-8501
jeisenhofer@gelaw.com
gnovod@gelaw.com

**GARDY & NOTIS, LLP**

By: */s/ Meagan Farmer*
Mark C. Gardy
James S. Notis
Meagan Farmer
Tower 56
126 East 56th Street, 8th Floor
New York, New York 10022
Tel:  212-905-0509
Fax:  212-905-0508
mgardy@gardylaw.com
jnotis@gardylaw.com
mfarmer@gardylaw.com

*Attorneys for Plaintiff*